SUPREME MERCHANDISE CO., INC., Respondent, v CHEMICAL BANK, Appellant.

First Department, June 5, 1986

## APPEARANCES OF COUNSEL

*Robert T. Stephenson* of counsel *(Harold Weisblatt* with him on the brief; *John B. Wynne,* attorney), for appellant.

*William E. Seeger* of counsel *(Miller & Seeger,* attorneys), for respondent.

## OPINION OF THE COURT

SANDLER, J. P.

In an appeal from a judgment in favor of petitioner, Supreme Merchandise Co., Inc. (Supreme), in a proceeding pursuant to CPLR 6214 (d) to compel the delivery of certain funds alleged to have been the subject of two orders of attachment, the central issue presented is whether the interest of the beneficiary in an executory negotiable letter of credit constitutes under CPLR 6202 "[a]ny debt or property against which a money judgment may be enforced as provided in section 5201".

In a carefully considered opinion, in which it understandably relied on the analysis set forth by the Court of Appeals in *ABKCO Indus. v Apple Film* (39 NY2d 670), Special Term held that the interest of the beneficiary constituted property within the meaning of the relevant statutory sections and, being assignable, was subject to attachment. Recognizing the question to be a close one, we have come to a different conclusion. The distinctive characteristics of a negotiable letter of credit, particularly when considered in light of the critical role performed by such instruments in international transactions, distinguish the beneficiary's interest in an executory letter of credit from the situation addressed in *ABKCO,* and persuade us that such an interest is not "property" within the meaning of CPLR 6202 and 5201 (b).

On or about March 1, 1984, Chemical Bank issued a letter of credit in the amount of $111,840. The account party was Supreme Importers (not to be confused with petitioner) and D.M. Sales Corp. The beneficiary was Iwahori Kinzoku Co., Ltd. (Kinzoku). In early March 1984, Supreme caused Chemical Bank to be served with an order of attachment and levy as a garnishee with respect to any property or debts due and owing Kinzoku. A preliminary records search failed to disclose any account held by Chemical in the name of Kinzoku, and the Sheriff and Supreme's counsel were so informed. Thereafter, at a time not clearly specified in the record, Chemical discovered a letter of credit relationship and so informed Supreme's counsel. On May 30, 1984, Chemical was served

with a second order of attachment and levy dated May 25, 1984. Both orders of attachment were confirmed by Special Term.

The letter of credit was a "time" letter of credit—30-day sight—and allowed partial shipment of the goods covered thereunder. Under the terms of the letter of credit, documents and drafts drawn thereunder could be freely negotiated by any bank, which would then make a presentment to Chemical for acceptance and payment.

Chemical was presented with a draft in the amount of $55,000 and relevant documentation from the Fuji Bank Ltd. of Tokyo, Japan (Fuji), on or about April 19, 1984. After the account party agreed to waive certain discrepancies in the documentation from the terms of the letter of credit, Chemical accepted the draft on or about April 27, 1984, and thereby engaged to pay the draft within the 30-day period. Payment was effected in favor of Fuji on or about May 29, 1984.

Chemical was also presented with a draft in the amount of $56,840 and relevant documentation from the Dai-ichi Kangyo Bank, Ltd. of Tokyo (Dai-ichi) on or about April 5, 1984. Once again, after the account party agreed to waive certain discrepancies in the documentation from the terms of the letter of credit, Chemical determined on April 17, 1984 to accept the draft and engaged to pay the amount within a 30-day period. After acceptance, the draft was presented for payment. However, payment was not effected until after service upon Chemical of the second order of attachment.

It is alleged in Chemical's papers that both negotiating banks informed Chemical that they had negotiated the documents for value prior to the service upon Chemical of the second order of attachment, and that neither had knowledge at the time of such negotiation of the existence of an order of attachment. Chemical also asserts that it had no knowledge of the existence or identity of a negotiating bank prior to the presentments described above to Chemical.

In this proceeding pursuant to CPLR 6214 (d) to compel delivery of funds representing the letter of credit amount of $111,840 plus interest, Supreme alleged that the first and second orders of attachment were applicable to the letter of credit proceeds. In response, Chemical argued that the first order of attachment was ineffective as to the proceeds of a purely executory letter of credit, and that the second order of attachment was served after Chemical had already "accepted"

drafts presented to it by negotiating banks, thus establishing a direct obligation on the part of Chemical to effect payment in their behalf.

In granting the petition to the extent of directing Chemical to deliver to the Sheriff of New York County the amount of the two drafts paid to Fuji and Dai-ichi, with interest, Special Term addressed only the issue raised with respect to the first order of attachment, concluding, as we have observed, that the beneficiary's interest in the letter of credit constituted property within the meaning of CPLR 5201 (b) and CPLR 6202.

As to that part of Supreme's claim that alleges Chemical's violation of the second order of attachment, served after Fuji and Dai-ichi had presented Chemical with drafts and accompanying documentation, little discussion is required. Whatever else may be in doubt, the record is clear that Chemical had accepted the drafts prior to the service of the second order of attachment. The precise issue was squarely addressed by the Court of Appeals under indistinguishable circumstances in *First Commercial Bank v Gotham Originals* (64 NY2d 287), and the Court of Appeals held that on acceptance of such drafts the issuing bank, pursuant to Uniform Commercial Code § 4-303 (1), "became directly, primarily and unconditionally obligated to the holder to pay them at maturity" (at p 297).

Turning then to the principal issue presented on appeal, analysis necessarily starts with a consideration of the controlling statutory provisions.

CPLR 6202 provides in pertinent part as follows: "Any debt or property against which a money judgment may be enforced as provided in section 5201 is subject to attachment."

CPLR 5201 in turn provides in pertinent part as follows:

"(a) Debt against which a money judgment may be enforced. A money judgment may be enforced against any debt, which is past due or which is yet to become due, certainly or upon demand of the judgment debtor, whether it was incurred within or without the state, to or from a resident or nonresident, unless it is exempt from application to the satisfaction of the judgment. A debt may consist of a cause of action which could be assigned or transferred accruing within or without the state.

"(b) Property against which a money judgment may be enforced. A money judgment may be enforced against any property which could be assigned or transferred, whether it

consists of a present or future right or interest and whether or not it is vested, unless it is exempt from application to the satisfaction of the judgment".

Also pertinent here is subdivision (c) (4), concerned with the designation of the proper garnishee for particular property or debt, which begins with the phrase "Where property or a debt is evidenced by a negotiable instrument for the payment of money," clearly indicating that an interest in a negotiable instrument may be either a debt or property.

The broad problem of construction presented by a consideration of CPLR 5201 (a) and (b), which gives rise to the kind of issue here presented, appears on the face of the two subdivisions. On the one hand, subdivision (a) is explicit that a debt not yet due is not subject to enforcement (and therefore not attachable under section 6202) unless it is to become due "certainly or upon demand of the * * * debtor". No similar limitation appears in subdivision (b) defining property. That subdivision permits enforcement (and therefore attachment) "against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested", with an exception not here relevant.

The question immediately presented by a textual study of these two subdivisions is whether a claim, such as one arising out of a contractual relationship which would be appropriately classifiable as a debt, albeit a contingent one, and which could not be reached under section 5201 (a) because of its contingent character, may fall within the purview of the definition of property in subdivision (b). In *ABKCO Indus. v Apple Film* (39 NY2d 670, *supra)* the Court of Appeals definitively answered this threshold question in the affirmative.

*ABKCO (supra)* involved an order of attachment in which a creditor sought to secure quasi in rem jurisdiction in New York over a debtor not present in this jurisdiction with regard to the debtor's interest in a licensing agreement under which the debtor was to receive 80% of the net profits received by the licensee from the promotion of a film. At the time the order of attachment was secured, no net profits had been generated by the promotion of the film, and there was no certainty that such profits would in fact be forthcoming.

The Court of Appeals flatly rejected the contention that the debtor's right could only be classified as a debt within the meaning of CPLR 5201 (a) and therefore not an attachable

debt, because it was neither "past due" nor "to become due, certainly or upon demand of the * * * debtor". The Court of Appeals concluded (39 NY2d 670, 674, *supra)* that the debtor's interest under the licensing agreement "constituted property, composed of the bundle of all its rights under the Agreement * * * That property was attachable because concededly it was assignable". The Court of Appeals went on to say (at p 675) that the attachment sought to reach "intangible personal property" belonging to the debtor, the situs of which was in New York, where there was to be found the other party to the licensing agreement upon whom rested the obligation of performance.

Finally, in a sentence particularly pertinent to the issue before us, the opinion went on to say *(supra,* at p 675): "We know of no threshold requirement that the attaching creditor show the value of the attached property or indeed that it has any value. Correlatively we know of no theory on which the debtor or the garnishee is entitled to a vacatur of the attachment if it can be established that the property in question is valueless."

The significance of the change in the law effected by *ABKCO (supra)* was explained by Professor David D. Siegel in a notable commentary that provides a helpful background to a consideration of the issue presented in this case. (Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C5201:5, p 53.) Professor Siegel noted that in the past claims existing in favor of a debtor against a garnishee had been excluded from levy by CPLR 5201 (a) and its prior law predecessors because the debtor's claim was technically contingent, and this had been true even though the debt "could be found to have an economic potential sufficient to make it well worth the * * * creditor's while to pursue it." (Siegel, *op. cit.,* at pp 53-54.) This prior rule had been changed by the decision in *ABKCO.* "Avoiding arbitrary distinctions, Abkco takes a pragmatic approach that gives the economic potential of the asset the upper hand" *(id.,* p 54). The *ABKCO* opinion accomplished this by giving the creditor the option of treating the asset as a "debt" under subdivision (a), or as "property" under subdivision (b).

Professor Siegel went on to observe *(id.,* p 55) that it seemed "quite appropriate to leave it to the * * * creditor to decide whether or not the contingent nature of a given asset makes it worth pursuing", noting that in *ABKCO* itself the potential proceeds of the film there involved (a "Beatles" film) made it a

much more attractive economic prospect than many a less contingent asset. Concluding that *ABKCO* did not leave much to be governed by subdivision (a), Professor Siegel suggested, however, that it might still have a role to play where there is an asset "whose ripening depends on too many contingencies * * * Perhaps what the Abkco case is really doing is taking from the unleviable 'contingency' realm only the asset which, though contingent, is reasonably *likely* to mature into something economically real" *(id.,* p 57).

In the only previously reported case to consider whether the interest of a beneficiary in an executory negotiable letter of credit was attachable as a debt or property under New York law, the court held that the interest was not attachable. *(Matter of Diakan Love v Al-Haddad Bros. Enters.,* 584 F Supp 782 [SDNY 1984].)* In a comprehensive, persuasively reasoned opinion, Judge Leval pointed out (at p 784) that it would stretch "the conventional meaning of words to consider the beneficiary's interest in a letter of credit as either its property in the hands of the bank or a debt owed to it by the bank * * * The conclusion that the beneficiary's interest in an executory letter of credit is not attachable property is further supported by the multi-party relationship which the letter constitutes. Whatever the interest of the beneficiary may be, the letter also implicates interests of at least the issuing bank and its customer who will often have posted security for the issuance of the letter. To permit the attachment on the theory that the letter represents simply property of the beneficiary would ignore and confound the inseparable interests of other parties."

Comparing the issue presented with the situation addressed in *ABKCO (supra),* Judge Leval found *ABKCO* to be distinguishable on two grounds. First, the attached obligation at issue in *ABKCO,* although unmatured and contingent on receipt of assigned royalties, was not executory as to future performance by the obligee-defendant. Second, and in his view, an even more important distinction, was the central importance of letters of credit to international trade, and the inescapable consequence that the capacity of the letter of credit to perform its critical function "would be severely impaired if asserted creditors were able to block their payment through service of attachment on an issuing or confirming bank of the intangible interest of the beneficiary. Financiers around the world could no longer be confident of the fulfillment of the expectations represented by a letter of credit

and would cease to advance payments in reliance on their integrity" (584 F2d 782, 785, *supra*).

In agreeing with the conclusion reached in *Diakan (supra)* *(see also, Sisalcords do Brazil v Fiacao Brasileira De Sisal,* 450 F2d 419 [5th Cir 1971], *cert denied* 406 US 919 [1972]), we do not intend to hold that a debtor's interest in a claim arising out of a contract may not be considered property merely because the maturing of the claim depends on some further action or performance by the debtor.

As applied to an executory letter of credit, that undeniably relevant circumstance is accompanied by other factors that collectively seem to us persuasive against classifying a debtor's contingent interest as property. If the debtor's interest were to be considered property under the relevant statutory sections, it would follow in many situations that an order of attachment secured by a creditor in an effort to reach the debtor's contingent interest would (1) cause the debtor not to take action necessary to the maturing of the claim, (2) disrupt separate contractual obligations involving unrelated parties, and (3) impair the capacity of letters of credit to discharge their important and intended functions. Considering the practical concerns that helped shape the rule adopted in *ABKCO (supra),* so clearly spelled out by Professor Siegel, we do not believe that the *ABKCO* construction is correctly interpreted as authorizing creditors to reach a debtor's contingent interest as property where the effort to do so will often preclude the maturing of that interest, is likely on a repetitive basis to impair the rights of third parties, and is certain to raise a disquieting doubt as to the capacity of letters of credit to discharge their critically important function in international transactions.

Accordingly, the order and judgment of the Supreme Court, New York County (Richard W. Wallach, J.), entered February 7, 1985, which, in a proceeding pursuant to CPLR 6214 (d), ordered defendant to pay to the Sheriff $111,840 plus interest alleged to have been paid by the defendant in violation of an attachment order, should be reversed, on the law, with costs, and the petition should be dismissed.

FEIN, MILONAS, KASSAL and ELLERIN, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered on February 7, 1985, unanimously reversed, on the law, and the petition dismissed. Appellant shall recover

of petitioner-respondent $75 costs and disbursements of this appeal.